No. 56 December 24, 2015 451

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

JACKELIN GONZALEZ-VALENZUELA,
*Petitioner on Review.*

(CC C100316CR; CA A146278; SC S061751)

En Banc

On review from the Court of Appeals.*

Argued and submitted May 7, 2014.

David L. Sherbo-Huggins, Deputy Public Defender, Salem, argued the cause for petitioner on review. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Erin Galli, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General, Salem.

LINDER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____

* Appeal from Washington County Circuit Court, Steven L. Price, Judge. 258 Or App 263, 303 P3d 1096 (2013).

**LINDER, J.**

Defendant was convicted of two counts of child endangerment under ORS 163.575(1)(b), which prohibits knowingly permitting a minor "to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted." The issue in this case is whether that statute is violated when a person knowingly possesses drugs in a container—here, a purse—while in a car with two children. As we will explain, contrary to defendant's argument, we conclude that a person in that circumstance can be found to have engaged in unlawful "activity" involving controlled substances. We agree with defendant, however, that when, as here, the possession of the drugs in the car is a brief isolated incident of illegal drug activity, the car is not, within the meaning of the statute, "a place" where unlawful activity involving controlled substances "is maintained or conducted." ORS 163.575(1)(b). We therefore conclude that defendant was entitled to a judgment of acquittal on the charges of child endangerment, and reverse the contrary decisions of the trial court and the Court of Appeals.

The facts of this case are not in dispute. Defendant and her five-year-old daughter were passengers in a borrowed car driven by defendant's 17-year-old daughter. A police officer stopped the car for a traffic violation and, during the stop, noticed objects in defendant's open purse that appeared to be drugs. The officer asked for consent to search the car, which defendant gave. As a result of the consent search, the officer confirmed that defendant's purse contained drugs—specifically, small amounts of heroin, methamphetamine, and methadone. Based on those facts, defendant was charged with unlawful possession of heroin (ORS 475.854), unlawful possession of methamphetamine (ORS 475.894), unlawful possession of a controlled substance (ORS 475.840(3)(b), *renumbered* ORS 475.752(3)(b)), and two counts of child endangerment (ORS 163.575).

At the end of a short bench trial, defendant argued for acquittal on the two counts of child endangerment, asserting that the state's evidence was insufficient to

establish liability under ORS 163.575(1)(b).[1] She presented two grounds for acquittal. First, she argued that possession is passive and therefore cannot be "activity," as that term is used in the statutory phrase "unlawful activity involving controlled substances." *Id.* Second, she argued that, even if possession is "activity," a brief isolated incident of illegal drug activity in a particular "place" is insufficient as a matter of law to establish that the place is one where drug activity "is maintained or conducted." *Id.* On the latter point, defendant asserted that, to satisfy the statute, the drug activity must occur with some degree of regularity, which would require the state to prove more than a brief isolated incident. The trial court rejected both of defendant's arguments and convicted her of four counts of illegal drug possession and two counts of child endangerment.

On appeal, defendant challenged the child-endangerment convictions on the same grounds that she asserted in the trial court. *State v. Gonzalez-Valenzuela*, 258 Or App 263, 268-72, 308 P3d 1096 (2013).[2] The Court of Appeals first held that possession is "activity" within the meaning of the child-endangerment statute. *Id.* In doing so, the Court of Appeals interpreted the term "activity" in light of a contemporaneously passed statute that treated possession as a type of "'criminal *activity* in drugs.'" *Id.* at 269-70 (quoting *former* ORS 167.207(1), *repealed by* Or Laws 1977, ch 745, § 54; emphasis added). Given that context, the Court

---

[1] Defendant did not expressly move for judgment of acquittal. Instead, she challenged the legal sufficiency of the state's evidence in her closing arguments. Because she opted for a bench trial, defendant made her closing argument to the trial court. The Court of Appeals treated defendant's closing argument as a motion for judgment of acquittal. *State v. Gonzalez-Valenzuela*, 258 Or App 263, 265 n 3, 308 P3d 1096 (2013). We agree with the long-standing case law from the Court of Appeals that, under the circumstances, defendant's closing argument was the equivalent of a motion for judgment of acquittal and, therefore, preserved the issue that defendant presents. *Compare State v. Forrester*, 203 Or App 151, 155, 125 P3d 47 (2005) (by challenging evidence as insufficient as matter of law to support conviction, defendant made functional equivalent of motion for judgment of acquittal in argument to trial court), *with State v. Schodrow*, 187 Or App 224, 231, 66 P3d 547 (2003) (where defendant argued for existence of element that state must prove, not adequacy of evidence to prove element, issue preserved was functional equivalent of challenge to jury instructions, not motion for judgment of acquittal; proper relief was reversal with remand, not outright reversal).

[2] Defendant did not challenge her convictions for illegal drug possession. *Id.* at 264.

of Appeals concluded that the legislature intended to include illegal drug possession within the statutory phrase "unlawful activity involving controlled substances." *Id.* at 270-72.[3] The Court of Appeals therefore rejected defendant's first argument.

The Court of Appeals also rejected defendant's second argument: that a "place" is one where illegal drug activity "is maintained or conducted" only if the illegal drug activity occurs regularly at that place. *Id.* at 268-72. The operative question, according to the Court of Appeals, was "not whether unlawful activity exists in a place, but whether that activity is being 'maintained or conducted'" in a place. *Id.* at 268. After reviewing dictionary definitions for "maintain" and "conduct," the Court of Appeals concluded that "unlawful activity in a place can be 'maintained' through a continuation of the status of an unlawful act or 'conducted' if the unlawful activity is immediately occurring under the direction of a person." *Id.* The Court of Appeals held that defendant "maintained" possession of drugs in the car by "carrying, storing, and concealing those substances in her purse." *Id.* at 268-69. Because the Court of Appeals affirmed defendant's conviction by applying the definition of "maintained," it did not address whether defendant's conviction could be affirmed under the definition of "conducted." *Id.* at 269.

Chief Judge Haselton agreed with the interpretive analysis in the majority opinion but wrote separately to highlight three concerns, which he thought were best addressed through legislative amendment. *Id.* at 272-74. First, he worried that applying the child-endangerment statute to a parent's "surreptitious possession of drugs" went beyond the legislative intent behind the statute. *Id.* at 272-73. Second, he believed that the "practical upshot" of the analysis is that a parent possessing drugs in the presence of his or her children could be charged with separate

---

[3] The current version of the child-endangerment statute refers to "unlawful activity involving controlled substances," ORS 163.575(1)(b), but the original version referred to "unlawful narcotic or dangerous drug activity," Or Laws 1971, ch 743, § 177. The legislature made that change in 1979 only to modernize the language in the statute. *See* Or Laws 1979, ch 744, § 8 (making only linguistic rather than substantive changes). That change does not affect our analysis.

possession and endangerment charges and sentenced to consecutive sentences. *Id.* at 273. Third, he was concerned that the reasoning used in the opinion would mean that "anywhere a person merely possesses drugs is 'a place where unlawful activity involving controlled substances is maintained or conducted,'" including, for example, "a supermarket, a church, or a synagogue—or, for that matter, our courtroom, Reser Stadium, or the Rose Festival Fun Center." *Id.* (quotation omitted).

In this court, defendant challenges her convictions for child endangerment by asserting the same two arguments that she made to the trial court and the Court of Appeals. "On review of a challenge to a denial of a motion for acquittal, we view the facts in the light most favorable to the state and consider whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Zweigart*, 344 Or 619, 632, 188 P3d 242 (2008). If the parties dispute the meaning of the essential elements of the offense, then we must first determine the meaning that the legislature intended—a matter of statutory construction—before we can determine whether the trial record supports the defendant's conviction. In this case, the parties do not dispute the facts established by the trial record and instead dispute only the meaning of the essential elements of child endangerment under ORS 163.575(1)(b). This case, therefore, presents an issue of statutory construction.

Under our usual method for resolving issues of statutory construction, "[w]e begin with the text and context of the statute, which are the best indications of the legislature's intent. If appropriate, we also consider the statute's legislative history. Finally, if the statute's meaning remains unclear, we may resort to general maxims of statutory construction." *State v. Walker*, 356 Or 4, 13, 333 P3d 316 (2014).

The relevant subsection of the child-endangerment statute states:

"(1)   A person commits the offense of endangering the welfare of a minor if the person knowingly:

"* * * * *

"(b)    Permits a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted[.]"

ORS 163.575(1)(b).

As already noted, defendant first contends that possession is not "activity," as that term is used in subsection (b). Although neither "possession" nor "activity" is specifically defined by statute, the legislature has provided relevant definitions for "possess" and "act." "'Possess' means to have physical possession or otherwise to exercise dominion or control over property." ORS 161.015(9).[4] Defendant is correct that "to have * * * possession" generally does not refer to an action but instead refers to a state of affairs or state of being. *See* Randolph Quirk *et al*, *A Comprehensive Grammar of the English Language* 178 (1985) (noting that "have" expresses a stative meaning when it is used to mean "possess"); Tom McArthur ed., *Oxford Companion to the English Language* 985 (1992) (contrasting stative verbs, which "refer to states of affairs," with dynamic verbs, which "refer to actions").[5] Drug possession most often begins with an action to acquire the drugs and ends with an action to dispose of them, whatever the disposition. Drug possession occurs between those two actions but is itself not necessarily an action. After acquiring drugs, a person can continue possessing them while taking no additional action and while doing nothing at all. Defendant contends that, although she possessed the drugs in the car, her possession was passive, consisting only of her failure to dispose of the drugs. That passivity, defendant argues, should not be treated as "activity" under ORS 163.575(1)(b), and therefore, no illegal drug activity was maintained or conducted in the car.

---

[4] This case involves physical possession of drugs. We do not address the extent to which constructive possession might constitute "an unlawful activity involving controlled substances" under ORS 163.575(1)(b). *See State v. Daniels*, 348 Or 513, 520, 234 P3d 976 (2010) ("The concept of constructive possession broadens the scope of the crime of possession beyond physical control.").

[5] Other examples of verbs with stative meanings include "own" and "contain." To say that someone "owns" a house is not to describe an action but to describe that person's status as a homeowner. Similarly, to say that a box "contains" files is to describe its contents rather than an action that the box has undertaken.

At first blush, it may seem counterintuitive to describe a failure to act as an action. In fact, however, it is common—at least, in the law—to do so. Courts, for example, often refer to culpable conduct as an act, regardless of whether the culpability stems from a party's act or failure to act. For example, the law may describe a party as having "*acted* negligently" by "*failing* to appear" for certain legal proceedings. *In re Carini*, 354 Or 47, 58, 308 P3d 197 (2013) (emphasis added). Likewise, an insurer can be described as having "*acted* in bad faith in *failing* to make or in unduly delaying an offer or counteroffer to settle." *Eastham v. Oregon Auto. Ins. Co.*, 273 Or 600, 608, 540 P2d 364 (1975) (emphasis added).

The legislature that passed the child-endangerment statute expressly adopted that broad understanding of activity as encompassing both culpable action and culpable inaction. The child-endangerment statute was enacted by the legislature in 1971 as part of a bill, largely drafted by the Oregon Criminal Law Revision Commission, that overhauled Oregon's criminal code. Or Laws 1971, ch 743, § 177, *codified as* ORS 163.575. That same bill defined "to act" as "either to perform an act or to omit to perform an act." Or Laws 1971, ch 743, § 7(5), *codified as* ORS 161.085(5). The bill also stated, "'[O]mission' means a failure to perform an act the performance of which is required by law." Or Laws 1971, ch 743, § 7(3), *codified as* ORS 161.085(3); *see also* Or Laws 1971, ch 743, § 7(4), *codified as* ORS 161.085(4) (defining "conduct" as "an act or omission and its accompanying mental state"). Those definitions remain in effect.

By prohibiting defendant's possession of drugs—ORS 475.854, ORS 475.894, ORS 475.752(3)—the law required defendant to dispose or otherwise divest herself of drugs that she possessed unlawfully. Thus, defendant failed to perform an act required by law when she failed to rid herself of the drugs that she possessed. That omission constituted an act, and that act occurred in the car. Therefore, while defendant was in the car, she engaged in "illegal activity involving a controlled substance." ORS 163.575(1)(b).

Further statutory context confirms that the legislature intended "activity" to include possession. As the Court

of Appeals pointed out, the same bill that created the child-endangerment offense also established the offense of "criminal activity in drugs," which included possession:

> "A person commits the crime of *criminal activity in drugs* if he knowingly and unlawfully manufactures, cultivates, transports, *possesses*, furnishes, prescribes, administers, dispenses or compounds a narcotic or dangerous drug."

*Former* ORS 167.207(1) (emphases added), *repealed by* Or Laws 1977, ch 745, § 54. We need not decide the extent to which the phrase "unlawful activity involving controlled substances" in the child-endangerment statute overlaps with the scope of the phrase "criminal activity in drugs" in *former* ORS 167.207(1). The fact that possession is included as "criminal activity in drugs" confirms that the legislature intended possession to be "activity" and fall within "unlawful activity involving controlled substances." We therefore reject defendant's first argument and hold that illegal drug possession may constitute "unlawful activity involving controlled substances." ORS 163.575(1)(b).

Defendant's second argument raises the question of whether a brief isolated incident of illegal drug possession in a place is sufficient to establish that the place is one "where unlawful activity involving controlled substances is maintained or conducted." ORS 163.575(1)(b). Defendant contends that a brief isolated incident of drug activity is insufficient, because that statutory phrase is best read as referring to a drug house or opium den or some other place where the drug activity occurs with enough regularity for the place to be associated with drug activity. In that sense, defendant asks the court to incorporate standards like those often required to establish a criminal nuisance for maintaining a drug house. *See, e.g.*, ORS 167.222 (prohibiting maintaining a place resorted to by drug users). The state, on the other hand, argues that the plain meaning of the relevant statutory terms includes no limitations requiring proof that the drug activity occurred regularly. Based on that reading, the state asks this court to affirm defendant's convictions for child endangerment.

As described above, we approach issues of statutory interpretation by reading the text in context with

any relevant legislative history and, if necessary, applicable canons of construction. *Walker*, 356 Or at 13. None of the relevant statutory terms related to this issue is defined by statute.[6] Without a statutory definition, "we ordinarily look to the plain meaning of a statute's text as a key first step in determining what particular terms mean." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295, 337 P3d 768 (2014).

Defendant argues that an ordinary English speaker could reasonably describe a drug house or opium den as "a place where unlawful activity involving controlled substances is maintained or conducted." According to defendant, those words refer to a particular *type* of place—namely, one that is used principally or substantially to serve drug-related purposes rather than any place where drug activity may have occurred on one occasion. Defendant's reading conforms to our normal understanding of similar phrases. For example, if someone referred to "a place where surgery is performed," we likely would assume that the person was referring to a hospital and not any place where a surgery may have occurred, such as a sidewalk where emergency surgery was performed once following an accident. We would not normally think that a single incident of emergency surgery converts that sidewalk into "a place where surgery is performed."

The state, on the other hand, contends that the plain meaning of the relevant terms suggests a broader understanding than that offered by defendant. According to the state, an ordinary English speaker could reasonably say that, under the facts of this case, defendant "maintained" possession of drugs, or otherwise "conducted" drug activity, while she was in the car, even if that drug activity was brief or isolated. The state argues, as a result, that the car was "a place where drug activity is maintained or conducted." The state supports that argument by relying on the dictionary definitions of "maintain" and "conduct."

---

[6] Two of the relevant terms are "activity" and the verb form of "conduct." As noted above, the legislature has defined "to act" and the noun form of "conduct." ORS 161.085(5) (defining "to act"); ORS 161.085(4) (defining "conduct"). Although those definitions were relevant to defendant's first argument, they do not speak to defendant's argument that the activity must occur regularly.

"[A]s stilted as the approach may sometimes seem," this court frequently attempts to resolve disputes about plain meaning by consulting dictionary definitions of the relevant terms. *Comcast*, 356 Or at 296. However, we have also stressed that, "[i]n construing statutes, we do not simply consult dictionaries and interpret words in a vacuum." *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011). Although dictionaries may provide a useful starting point to identifying the plain meaning of a statute, this case highlights their limitations.

As an initial matter, not all disputes about plain meaning can be resolved by defining a particular word or words. Sometimes disputes about plain meaning instead turn on the meaning conveyed through the grammar and structure of the relevant provision. *See, e.g.*, *Cuff v. Department of Public Safety Standards*, 345 Or 462, 470, 198 P3d 931 (2008) (relying on verb tense); *Baker v. City of Lakeside*, 343 Or 70, 74, 164 P3d 259 (2007) (noting that two interpretations were "[g]rammatically * * * permissible"). And even when the dispute centers on the meaning of a particular word or words, a dictionary definition—although providing some evidence of meaning—should not be relied on to resolve a dispute about plain meaning without critically examining how the definition fits into the context of the statute itself. That context may dictate applying one definition rather than another, if the dictionary contains multiple definitions for a relevant term. *See* *Kohring v. Ballard*, 355 Or 297, 304, 325 P3d 717 (2014) ("[W]e examine word usage in context to determine which among competing definitions is the one that the legislature more likely intended."). That context may also reveal that the dictionary contains no definitions clarifying the issue in dispute. *See, e.g.*, *State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006) (looking beyond dictionary definitions where the definitions could not "be said to clarify the issue").

Further, a statute's plain meaning is frequently more than the sum of its individually defined terms. Dictionary definitions lack context and often fail to capture the nuanced connotations conveyed by the normal use of a term in a particular context. Those more nuanced connotations may represent the plain meaning of a term in context even though those connotations result from tacit knowledge,

accumulated experience, and common sense that are not reflected well—if at all—in dictionary definitions. *See, e.g.*, *Kohring*, 355 Or at 305 (departing from the dictionary definition of "sustained" because "[i]n the context of ORS 14.080, it seems clear that the legislature did not intend the term to be understood literally"). As a result, "dictionaries are only the starting point for our textual analysis," *State v. Clemente-Perez*, 357 Or 745, 765, 359 P3d 232 (2015), and should not be used as the ending point.

In this case, the Court of Appeals rejected defendant's reading of the child-endangerment statute based on the dictionary definitions of "maintain" and "conduct." Relying on *Webster's Third New International Dictionary* (unabridged ed 2002), the Court of Appeals concluded that "maintain" means "'**1:** to keep in a state of repair, efficiency, or validity **:** preserve from failure or decline \* \* \* **3:** to persevere in **:** carry on **:** keep up **:** CONTINUE.'" *Gonzalez-Valenzuela*, 258 Or App at 268 (quoting *Webster's* at 1362). It further concluded that "conduct" means "'[**2**]**b:** to have the direction of **:** RUN, MANAGE, DIRECT <~s a scientific experiment> <~s a daily newspaper column> <~s a small business enterpriser>.'" *Id.* (quoting *Webster's* at 474).

Based on those dictionary definitions, the Court of Appeals concluded that "unlawful activity in a place can be 'maintained' through a continuation of the status of an unlawful act or 'conducted' if the unlawful activity is immediately occurring under the direction of a person." *Id.* The Court of Appeals explained that, "[v]iewed in that fashion, defendant's conduct in possessing, transporting, storing, and concealing the controlled substances in her purse maintained the status of her possession of those substances." *Id.* In effect, the Court of Appeals determined that the dictionary definition of "maintain" could encompass a brief isolated incident of drug activity and did not require that the activity occur regularly. Because defendant—at least, in that sense of the word—"maintained" unlawful drug possession in the car, the Court of Appeals concluded that the car was a place where unlawful drug activity was maintained. The Court of Appeals held that "[u]nder the plain meaning of the word 'maintain,' then, defendant's conduct violated ORS 163.575(1)(b)." *Id.* at 269.

The state asks us to adopt that analysis as well, arguing that defendant's reading imposes a requirement of regularity or duration that is not supported by the plain meaning of the statute's words.[7] But the question that neither the state nor the Court of Appeals addresses is why the definitions of "maintain" and "conduct" resolve the question of whether a brief isolated incident of drug activity in a place makes that "a place where unlawful activity involving controlled substances is maintained or conducted."

The state and the Court of Appeals are correct that the definitions of "maintain" and "conduct" do not, by themselves, require the type of regularity or duration asserted by defendant. Even "maintain," which connotes some sense that the event occurs over time, may be used to describe momentary events, such as, "The player maintained possession of the ball as he crossed the plane of the end zone." Although that sentence suggests that the player's possession occurred both before he crossed the plane and after he crossed the plane, neither of those states needs to take much time.

Nevertheless, the dictionary definitions of "maintain" and "conduct" do not resolve the parties' dispute. When assessing the plausibility of competing interpretations, we consider dictionary definitions, among other potential sources of meaning, to determine whether an offered interpretation is *permitted*. "Dictionaries, after all, do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." *Cloutier*, 351 Or at 96.[8]

---

[7] According to the state, defendant's reading therefore violates ORS 174.010, which states: "In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]" However, relying on ORS 174.010 at this stage begs the question of "what is *** contained" in the statute. Although ORS 174.010 instructs us to disregard terms or substance not contained in the statute, that instruction does not help us determine the terms and substance that *are* contained in the statute, which is the question before us.

[8] *See* Lawrence M. Solan, *The New Textualists' New Text*, 38 Loy LA L Rev 2027, 2056 (2005) ("The problem with using dictionaries to determine the ordinary meaning of a word *** is that the purpose of a dictionary is to determine the outer boundaries of appropriate usage for each entry."); Henry M. Hart, Jr. & Albert M. Sacks, *The Legal Process: Basic Problems in the Making and*

Although the state and the Court of Appeals are correct that the dictionary definitions of "maintain" and "conduct" lack a requirement of duration and regularity, that fact means only that "maintain" and "conduct" may refer to events of *either* short or long duration or events that are *either* isolated or regular. For example, the bare statement, "The company maintained/conducted its normal manufacturing operation," does not by itself tell us how long or how frequently the company engaged in that activity.[9]

Thus, the lack of a requirement for duration and regularity in the dictionary definitions of "maintain" and "conduct" establishes that both parties' interpretations might be *permitted* but neither is *required*. To determine whether the legislature intended for a brief isolated incident of drug activity in a place to make it "a place where unlawful activity involving controlled substances is maintained or conducted," we must consider the possible sources of duration and regularity beyond the dictionary definitions of "maintain" and "conduct."

One potential source of duration and regularity is verb tense. A verb used in the simple present tense may express habitual activity, which "impl[ies] an inherently unrestricted time span" and "refers to a whole sequence of events, repeated over the period in question." Quirk, *Comprehensive Grammar of the English Language* at 179. An example of habitual activity conveyed by the simple present tense is "She rides her bike to work." That sentence refers to a particular woman's regular mode of transportation to work. That sentence likely would not be used to refer to a woman who had ridden her bike to work only once, particularly if she had no intention to do it regularly in the future.

The statutory phrase "is maintained or conducted" is also in the simple present tense, although it is stated in

---

*Application of Law* 1190-91 (William N. Eskridge, Jr. & Philip P. Frickey eds., 1994) ("A dictionary, it is vital to observe, never says what meaning a word *must* bear in a particular context. Nor does it ever purport to say this." (Emphasis in original.)).

[9] One could say, "Although production usually stops from noon to 1:00 p.m., today *the company maintained/conducted its normal manufacturing operation* during the lunch hour." Or one could say, "*The company maintained/conducted its normal manufacturing operation* throughout the holiday season."

the passive voice. *Id.* at 159 (noting that "kisses" is the simple present tense in active voice and "is kissed" is the simple present tense in the passive voice). The relevant phrase in the child-endangerment statute could be rewritten in the active voice as "a place where a person maintains or conducts, or persons maintain or conduct, unlawful activity involving controlled substances."

Although we do not say—using an example from above—that a single incident of emergency surgery converts a sidewalk into a "place where surgery *is* performed," a sidewalk where surgery occurred once may be referred to as a "place where surgery *was* performed." And if the surgery is happening in the moment, then the sidewalk may be described as a "place where surgery *is being* performed." Neither the past tense nor the present progressive tense convey the sense of habitual activity that may be conveyed by the simple present tense. Similarly, "a place where unlawful activity involving controlled substances *was* maintained or conducted" and "a place where unlawful activity involving controlled substances *is being* maintained or conducted" are not the same as "a place where unlawful activity involving controlled substances *is* maintained or conducted."

Both the state and the Court of Appeals depart from using simple present tense in their analyses. For example, as the Court of Appeals framed it, "The precise inquiry is not whether unlawful activity exists in a place, but whether that activity *is being* 'maintained or conducted' therein." *Gonzalez-Valenzuela*, 258 Or App at 268 (emphasis added).[10] Likewise, the state argues in its brief that the intent of the statute was to prevent minors "from being at the place where the [drug] activity *is being* maintained or conducted." (Emphasis added.) The state also argues that "the car carrying defendant and her daughters was a place where unlawful drug activity *was* maintained or conducted."

_____

[10] This court used a similar construction in *State v. McBride*, 352 Or 159, 164, 281 P3d 605 (2012) ("The illegal conduct is not the use of drugs in a minor's presence. It is, instead, the act of permitting the minor to enter or remain where illegal drug activity *is occurring*." (Emphasis added.)). However, the issue in *McBride* was only the meaning of "permits." Nothing in *McBride* states the standard for determining whether a place is "a place where unlawful activity involving controlled substances is maintained or conducted." ORS 163.575(1)(b).

(Emphasis added.) And the state most frequently character-izes the question as being whether "the legislature intended the unlawful transportation and possession of a drug *to con-stitute maintaining and conducting* an unlawful drug activ-ity." (Emphasis added.)

None of those constructions, however, is faithful to the words and context of the statute, which remain "the best indications of the legislature's intent." *Walker*, 356 Or at 13. "[W]e do not lightly disregard the legislature's choice of verb tense, because we assume that the legislature's choice is purposeful." *Martin v. City of Albany*, 320 Or 175, 181, 880 P2d 926 (1994). If the legislature used the simple present tense in the child-endangerment statute with the intent of conveying habitual activity, then the verb tense would sup-port defendant's position.

The problem with that analysis is that the simple present tense may express other meanings as well. One of the other meanings expressed by the simple present tense is "timeless" statements, like scientific, mathematic, or geographic facts, such as, "Water boils at 100°C." Quirk, *Comprehensive Grammar of the English Language* at 179. Statutes are often written as legal facts. The legislature has used the simple present tense throughout the criminal code with that intended meaning. For example, the crimi-nal homicide statute enacted in 1971 stated: "A person *com-mits* criminal homicide if, without justification or excuse, he intentionally, knowingly, recklessly or with criminal negli-gence *causes* the death of another human being." Or Laws 1971, ch 743, § 87(1), *codified as* ORS 163.005(1) (emphasis added). The legislature undoubtedly did not intend that pro-vision to impose criminal penalties only on those who habit-ually cause the deaths of another human being. Similarly, other parts of the child-endangerment statute use the sim-ple present tense with the intention of expressing timeless legal facts: "A person *commits* the offense of endangering the welfare of a minor if the person knowingly *** [*p*]*ermits* a person under 18 years of age ***." ORS 167.575(1)(b) (emphases added). If the legislature used the simple present tense in the relevant part of the child-endangerment statute to convey a statement of timeless fact, then the verb tense would not favor either party.

Thus, without more, the verb tense is ambiguous, because the legislature's use of the simple present tense may indicate an intent to refer either to habitual conduct or to timeless facts. It may be that those examples of the simple present tense used when referring to timeless facts are grammatically distinct from its use in the relevant portion of the child-endangerment statute at issue—"is maintained or conducted"—which need not refer to the actions of the person committing the offense but can refer instead to the conditions under which that person acts. Even if those uses are distinct, we would be hesitant to resolve that grammatical ambiguity by presuming that the legislature intended to place so much weight on such a subtle distinction.

Nevertheless, we find sufficient support for defendant's reading in other contextual clues of the legislature's intent, namely, the legislature's use of "place." "Place" has broad and narrow definitions respectively supporting the state and defendant. The state asserts that "the plain meaning of 'place' is 'physical environment **:** SPACE' and 'an indefinite region or expanse **:** AREA.'" (Quoting *Webster's* at 1727.) But "place" can have other meanings, and the state provides no argument for why the legislature intended the definitions it offers.

In addition to the definitions offered by the state, *Webster's* also defines "place" to mean "a building or locality used for a special purpose <*place* of amusement> <*place* of worship> <a secondhand car *place* —Robert Westerby>." *Webster's* at 1727. In *Clemente-Perez*, we recently acknowledged that meaning of "place," which denotes a particular purpose: "Reading the phrase 'place of residence' as a whole, the term 'place' can be viewed as further describing (and limiting) the area excepted from the general provisions of ORS 166.250—that is, that one's 'place of residence' is the particular structure set apart *for residential purposes*." 357 Or at 764-65 (emphasis added). That meaning of "place" is consistent with the defendant's reading of the child-endangerment statute—namely, that the phrase "a place where unlawful activity involving controlled substances is maintained or conducted" refers to a place used principally or substantially to serve drug-related purposes.

In *State v. Smith*, 31 Or App 749, 571 P2d 542 (1977), the Court of Appeals used a similar analysis to interpret the drug-promotion statute, which was amended and re-enacted by the 1971 legislature, Or Laws 1971, ch 743, § 376. At that time, the drug-promotion statute stated:

> "A person commits the offense of criminal drug promotion if he knowingly maintains, frequents, or remains at a place:
>
> "(a)  Resorted to by drug users for the purpose of unlawfully using narcotic or dangerous drugs; or
>
> "(b)  Which is used for the unlawful keeping or sale of narcotic or dangerous drugs."

ORS 167.222(1) (1977). The defendant in *Smith* was convicted of drug promotion based on evidence that she "became aware that marihuana was present and being sold when [the resident and an undercover officer] made a deal, and 'remained' in the apartment for the brief interval thereafter a matter of minutes until [the undercover officer] returned and arrested her." *Smith*, 31 Or App at 753.

The Court of Appeals in *Smith* addressed whether that evidence was sufficient to establish liability under the drug-promotion statute. The state argued that the defendant had remained in a place that had been "used for the unlawful keeping or sale of narcotic or dangerous drugs." ORS 167.222(1) (1977). There was no dispute that drugs had been used or sold at the apartment on one occasion, but there was no evidence that drug activity otherwise had occurred there.

The Court of Appeals understood the interpretive question raised as "focus[ing] on the nature of the 'place' in which a person must remain to be in violation." *Smith*, 31 Or App at 753. The Court of Appeals traced the "historical antecedents" of the drug-promotion statute to previous criminal nuisance statutes and determined that the drug-promotion statute was not intended to apply to "any place, but only *** a certain 'type' of place." *Id.* at 755 (quoting *former* ORS 474.130(3)). The Court of Appeals held that the legislature intended for the drug-promotion statute to apply to "a place where a *principal or substantial purpose*

is the commercial sale or use of illegal drugs." *Id.* (emphasis added). In that sense, the Court of Appeals interpreted the drug-promotion statute "as a modern version of the statute *** [that] prohibited frequenting 'an opium den.'" *Id.* at 755 (citing *State v. Sam*, 14 Or 347, 13 P 303 (1887)). As a result, in that case, the Court of Appeals interpreted the drug-promotion statute as a continuation of previous criminal nuisance statutes and held that "evidence of a single occasion of use or sale of illegal drugs at a given place *** is insufficient as a matter of law to sustain a conviction for criminal drug promotion." *Id.*

Thus, although the Court of Appeals in *Smith* did not consult dictionary definitions, it nevertheless analyzed the issue consistently with the usual methodology that this court applies: The text was not "read in isolation but [was] considered in context," including "'the preexisting common law and the statutory framework within which the law was enacted.'" *Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (quotation omitted). Using that context, the Court of Appeals understood "place" consistently with *Webster's* narrower definition of the word—namely, as "a building or locality used for a special purpose." *Webster's* at 1727.[11]

Although the drug-promotion statute is a continuation of a prior criminal nuisance statute, the child-endangerment statute is not. Nevertheless, the standards for establishing a criminal nuisance are relevant. The child-endangerment statute is part of a patchwork of statutes intended as a continuation of a previous statute prohibiting contributing to the delinquency of a minor: *former* ORS 167.210 (1969), *repealed by* Or Laws 1971, ch 743, § 432. This court had previously held that contribution statute to be unconstitutionally vague. *State v. Hodges*, 254 Or 21, 28, 457 P2d 491 (1969). In attempting to ensure the continuing criminality of conduct previously prohibited under the contribution statute, the Criminal Law Revision Commission noted that "in almost every instance the same conduct could

---

[11] In fact, the Court of Appeals understood "place" to mean something slightly broader than the dictionary definition, because it was not limited to a "building or locality" but instead applied to "'[a]ny store, shop, warehouse, dwelling house, building, vehicle, boat, aircraft, or any place whatever.'" *Smith*, 31 Or App at 754 (quoting ORS 474.130(1)).

be prosecuted" under other sections of the proposed criminal code. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, 162 (July 1970).

The child-endangerment statute was intended to fill gaps left by those other sections and, therefore, was "designed to provide coverage for specific acts injurious to the welfare of minors not specifically prohibited elsewhere in the proposed Code." *Id.* at 178; *see also State v. McBride*, 352 Or 159, 164 n 3, 281 P3d 605 (2012) (discussing history of the child-endangerment statute). In particular, the Commission intended the relevant subsection of the child-endangerment statute to fill a gap between providing drugs to a minor and maintaining a drug house:

> "If a minor is sold or given illegal drugs, or if the actor maintains a place resorted to by drug users or used for the unlawful keeping or sale of drugs, the crime of criminal activity in drugs or criminal drug promotion would be committed."

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, 178.[12]

Thus, although the child-endangerment statute is not a continuation of a criminal nuisance statute, the gap it was intended to fill is still defined by reference to a criminal nuisance statute—namely, the drug-promotion statute, which prohibits maintaining a drug house. Defendant's reading of the child-endangerment statute fits that gap better than the state's reading. Under defendant's reading, the child-endangerment statute does not prohibit drug activity or drug houses, but prohibits allowing a minor to enter or remain in a drug house or similar location. In that sense, the relevant text from ORS 163.575(1)(b), "a place where unlawful drug activity is maintained or conducted," would be read as referring to a drug house.

---

[12] There are no reported cases applying the former contributing statute to the facts like those of this case. The Commission noted that, based on reported cases applying the former contributing statute, "the conduct punished under the statute primarily involved sexual or sexually lewd acts." *Id.* at 127. The Commission cited "one case involving drug use," in which the defendant facilitated the possession and use of drugs by the minors, rather than engaged in drug activity in the presence of minors. *Id.* (citing *State v. Holleman*, 225 Or 1, 357 P2d 262 (1960)).

Additionally, context from related statutes provides further support for defendant's reading. Not only was "place" given a similar meaning in the drug-promotion statute, ORS 167.222(1) (1977), but it was also given a similar meaning in another statute prohibiting conduct previously prohibited as a criminal nuisance: maintaining a "place of prostitution," ORS 167.012. *See also* ORS 167.002 ("'Place of prostitution' means any place where prostitution is practiced."); ORS 167.027(1), Or Laws 1971, ch 743, § 254 ("On the issue of whether a place is a place of prostitution as defined in ORS 167.002, its general repute and repute of persons who reside in or frequent the place shall be competent evidence.").

Further, the legislature has often used both "maintain" and "conduct" to refer to nuisances. For example, Oregon's criminal code, both before the 1971 revision that established the child-endangerment statute and in the 1971 revision itself, used "maintain" and "conduct" to refer to brothels, *former* ORS 465.120 (1969) *repealed by* Or Laws 1989, ch 846, § 15 (referring to "the person conducting or maintaining" a "bawdyhouse"), and saloons, ORS 471.640 (referring to property "used in conducting or maintaining such nuisance"). And the legislature had used the term "maintain" to refer to a nuisance created by a drug house. *Former* ORS 474.130(2) (1969), *amended by* Or Laws 1971, ch 743, § 376 ("No person shall keep or maintain such a common nuisance.").[13]

---

[13] It is not clear that "maintain" and "conduct" must be given distinct definitions. This court has previously observed that when "maintain" and "conduct" are used to describe the same thing, they largely mean the same thing. In the context of describing the authority conveyed by a license to "establish, conduct, or maintain a dental parlor," this court stated, "[T]here is no substantial distinction between 'conducting' a dental parlor and 'maintaining' or managing one." *State ex rel. Bloom v. State Bd. of Dental Examiners*, 96 Or 529, 536-37, 190 P 338 (1920). That is consistent with the fact that *Black's Law Dictionary* (4th rev ed 1968) defines both "maintain" and "conduct" as meaning, among other things, to "carry on." *Id.* at 367, 1105. And in turn, *Black's* defines "keep" as meaning "[t]o maintain, carry on, conduct, or manage; as, to 'keep' a liquor saloon, bawdy house, gaming table, nuisance, inn, hotel or policy game." *Id.* at 1006; *see also Riley Hill Gen. Contractor, Inc. v. Tandy Corp.*, 303 Or 390, 396, 737 P2d 595 (1987) (considering the use of synonymous pairs); David Mellinkoff, *The Language of the Law* 122 (1963) (identifying "keep and maintain" as a synonymous pair historically used in the law).

Although "maintain" and "conduct" are similar, they may nevertheless be given distinct effect. *Cf.* ORS 174.010 (stating that statutes should be interpreted

The state claims that its broader interpretation is supported by the fact that the offense at issue is "endangering the welfare of a minor." ORS 163.575(1). According to the state, a minor's exposure to a single instance of drug activity can endanger the welfare of that minor, and, therefore, the text used in the child-endangerment statute should be interpreted to prohibit a single instance of drug activity in the presence of a child. This court, however, has previously stated that the focus of the child-endangerment statute is not the minor's exposure to drug activity. "The legislature in some circumstances has made it either a crime, or a more serious crime, to engage in particular conduct in the presence of a minor. The focus of [ORS 163.575(1)(b)], however, is different." *McBride*, 352 Or at 164 (citation omitted). That is confirmed by another subsection of the child-endangerment statute, which criminalizes allowing a minor "to *witness* an act of sexual conduct or sadomasochistic abuse." ORS 163.575(1)(a) (emphasis added). Instead, the focus of ORS 163.575(1)(b) is on the harm a minor experiences from being in a particular place associated with drug activity, not from being exposed to particular drug activity. *McBride*, 352 Or at 164 (so stating); *see also State v. Nease*, 46 Or 433, 440-41, 80 P 897 (1905) (stating that early criminal nuisance law prohibited keeping houses that "disturbed or injured the public peace or morals, by congregating large numbers of idle and dissolute persons in one place for vicious purposes").

Regardless, the state's attempt to reframe the question as being about whether a minor is harmed by

---

to "give effect to all" provisions). The distinction has less to do with what they mean and more to do with the types of direct objects with which they may be used. "Maintain" is more likely to apply to a state or a status, and "conduct" is more likely to apply to an event or occurrence. For example, we do not say, "A defendant maintained a drug sale and conducted possession." Instead, we say, "A defendant conducted a drug sale and maintained possession." Thus, the legislature's decision to use both "maintain" and "conduct" is not evidence that the legislature intended those terms to have distinct meanings. It is more likely that both terms were included to create the syntactic versatility needed to refer to the various types of drug activities covered by the phrase "unlawful activity involving controlled substances."

Nevertheless, we need not reach the issue of what "maintain" and "conduct" mean exactly, because, as noted above, we conclude this case is resolved on grounds other than the meaning of "maintain" and "conduct."

exposure to one incident of drug activity is not well taken. There are countless ways that one might endanger the welfare of a child; not all of them are criminalized by the child-endangerment statute. Instead, as noted above, the child-endangerment statute was "designed to provide coverage for specific acts." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, 178. One specific act covered by the child-endangerment statute is "permit[ting] a minor to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted." ORS 163.575(1)(b). We must interpret *that* phrase to determine whether it includes permitting a minor to enter or remain in a place where a brief isolated incident of drug activity has occurred.

Defendant offers a more plausible reading of that relevant statutory text in context. To be sure, the legislature could have been clearer if it had cross-referenced the drug-promotion statute expressly. But the state's theory of legislative intent also does not find its clearest expression in the text of the child-endangerment statute. We conclude that the legislature intended subsection (b) of the child-endangerment statute to be defined in reference to the criminal nuisance standards for drug houses and similar locations. Therefore, the phrase "a place where unlawful activity involving controlled substances is maintained or conducted," ORS 163.575(1)(b), refers to a place where a principal or substantial use of the place is to facilitate unlawful drug activity.

We need not, and do not in this case, decide the full range of facts that can or will satisfy that legal standard. In many circumstances, a reasonable jury may be able to draw competing inferences from the facts as to whether a particular location or venue qualifies as a "place" where unlawful drug activity is "maintained or conducted." Relevant to the determination will be the nature of the activity, its duration or frequency, and the degree to which the activity is an incidental, brief, spontaneous, or isolated occurrence in the particular place, or conversely, the degree to which it has become a quality or characteristic of the place itself. The facts of this case are straightforward, however, and

readily fail the legal meaning that we have identified; the state does not argue otherwise. Here, defendant rode with her daughters in a borrowed car, with drugs in defendant's purse. No evidence in this record would permit a reasonable inference that the car in which defendant was riding was used for drug activity in a way that would make that activity more than an incidental characteristic of the car itself. Instead, the only reasonable inference on this record—and the state effectively concedes as much—is that defendant's possession of drugs while in this car with her daughters was a brief isolated incident of drug activity. That evidence, as we have concluded, is legally insufficient to satisfy the child-endangerment statute. Consequently, the trial court at the conclusion of the bench trial in this case should have entered a judgment of acquittal.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.